**So Ordered.**



Patricia C. Williams
Bankruptcy Judge

**Dated: July 1st, 2013**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | DC Case No. 11-cv-00357-RMP |
| LLS AMERICA, LLC, et al., | Case No. 09-06194-PCW11 |
| Debtor(s). | |
| BRUCE P. KRIEGMAN, solely in his capacity as court-appointed Chapter 11 Trustee for LLS America, LLC | Adversary No. 11-80299-PCW |
| Plaintiff(s), | REPORT AND RECOMMENDATION RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COMMON ISSUES (ECF NO. 125) |
| vs. | |
| MARK BIGELOW, et al., | |
| Defendant(s). | |

The Honorable Patricia C. Williams, sitting in the United States Bankruptcy Court for the Eastern District of Washington, hereby files this Report and Recommendation regarding Plaintiff's Motion for Partial Summary Judgment on Common Issues (ECF No. 125) filed with the bankruptcy court in this adversary proceeding.

1          This Report and Recommendation is made pursuant to the Honorable Rosanna

2   Malouf Peterson's Order Granting Joinder and Withdraw of Reference and Referring

3   Back to Bankruptcy Court for Further Proceedings (ECF No. 28) and Order Granting

4   Motion for Clarification (ECF No. 35).

5          The Recommendation is that the Plaintiff's Motion for Partial Summary

6   Judgment be **GRANTED**. The basis for the recommendation is set forth in the

7   Memorandum Decision Re: Plaintiff's Motion for Partial Summary Judgment

8   attached hereto.

9                    /// END OF REPORT AND RECOMMENDATION ///

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | DC Case No. 11-cv-00357-RMP |
| LLS AMERICA, LLC, et al., | Case No. 09-06194-PCW11 |
| Debtor(s). | |
| BRUCE P. KRIEGMAN, solely in his capacity as court-appointed Chapter 11 Trustee for LLS America, LLC | Adversary No. 11-80299-PCW |
| Plaintiff(s), | MEMORANDUM DECISION RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COMMON ISSUES (ECF NO. 125) |
| vs. | |
| MARK BIGELOW, et al., | |
| Defendant(s). | |

This decision represents the bankruptcy court's report and recommendation to the district court regarding Plaintiff's Motion for Partial Summary Judgment (ECF No. 125) concerning the "common issues" defined by the parties and the court. The adversary proceedings were consolidated for the purpose of addressing the "common

issues." The two common issues are whether a Ponzi scheme existed, and when did the debtor become insolvent.

## **PROCEDURAL HISTORY**

An involuntary chapter 11 bankruptcy case was filed in this court on July 10, 2009, concerning LLS-A, LLC, under case No. 09-03910-PCW11. A voluntary chapter 11 bankruptcy case was commenced by Ralph Gamble as CEO of LLS America, LLC, in the bankruptcy court of Nevada on July 21, 2009. The Nevada bankruptcy court transferred venue of its case to this court on November 4, 2009 (No. 09-06194-PCW11, ECF No. 1). Also a voluntary chapter 11 bankruptcy case was filed in this court on February 21, 2011, concerning D&D and Associates, LLC, under case No. 11-00785-FLK11.

On March 15, 2010 (No. 09-06194-PCW11, ECF No. 168), Mr. Charles Brent Hall was appointed as an examiner (hereinafter "the Examiner") pursuant to 11 U.S.C. § 1104(d) and authorized to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, including, but not limited to:

a.    sales or transfers of assets and any related transactions between the debtor and any affiliate or insider as those terms are defined in 11 U.S.C. § 101(2) and (31);

b.      any transfer or transaction involving the debtor and any insider, affiliate, or member of management of the debtor which was improper or a misappropriation of funds of the debtor; and

c.      the debtor's present financial operations and business model to determine if the business model is profitable and to analyze the profitability of the business on a go-forward basis.

On April 7, 2011, the court signed an agreed order authorizing the appointment of a chapter 11 trustee in the underlying chapter 11 case (No. 09-06194-PCW11, ECF No. 321). Notice of the appointment of Mr. Bruce Kriegman as trustee of the debtor was filed on April 18, 2011 (No. 09-06194-PCW11, ECF No. 328).

The Examiner's investigation had revealed the existence of dozens of legal entities related to and formed by the owner of the initial two debtors. Those entities existed in various western states and Canada. Several of the entities appeared to have been and continued to be inactive, but many did not. On June 30, 2011, the chapter 11 trustee in the LLS America, LLC, bankruptcy case filed a nunc pro tunc motion for substantive consolidation of debtor and the non-debtor estates (No. 09-06194-PCW11, ECF No. 449), which included the following entities: 1) D&D and Associates, LLC (Case No. 11-00785-PCW11); 2) Team Spirit America, LLC; 3) LLS Canada, LLC; 4) Little Loan Shoppe America, LLC; 5) Little Loan Shoppe, Ltd.; 6) 639504BC, Ltd.; 7) Little Loan Shoppe Canada, LLC; 8) 0738106BC, Ltd.; 9) 0738116BC, Ltd.; 10)

0738126BC, Ltd.; 11) 360 Northwest Networks, LLC; and 12) LLS North America, LLC (collectively, the "LLS America Companies"). An order was entered granting the chapter 11 trustee's nunc pro tunc motion for substantive consolidation on September 8, 2011 (No. 09-06194-PCW11, ECF No. 771), substantively consolidating the LLS America Companies with the debtor LLS America, LLC, effective as of July 21, 2009 (the date of the LLS America, LLC bankruptcy filing). The consolidation order further stated that the assets and liabilities of the LLS America Companies would be pooled with the assets and liabilities of LLS America, LLC, the debtor herein, and would be administrated by the chapter 11 trustee for the benefit of the creditors of the consolidated debtor (hereinafter "LLS" or "debtor").

In the summer of 2011, the trustee filed approximately 225 adversary proceedings seeking to recover funds transferred from the debtor to hundreds of "investors" or "lenders" as fraudulent transfers under 11 U.S.C. § 548 and RCW 19.40.041. A few of the adversary proceedings sought recovery from defendants who were not investors or lenders, but had other relationships with the debtor. The trustee confirmed a chapter 11 plan on October 25, 2012 (No. 09-06194-PCW11, ECF No. 1403). That plan devotes the proceeds of recovery in the adversary proceedings to the repayment of creditors.

Many of the defendants were residents of Canada and various decisions were rendered concerning service of process and jurisdiction, particularly the court's

memorandum decision in adversary proceeding No. 11-80093-PCW, ECF No. 146. The defendants and, on occasion, the plaintiff, requested that final judgment in many of the adversary proceedings be entered by the district court and those cases will be tried before that court. Some of the adversaries will be tried before the bankruptcy court. This decision is applicable to each type of adversary.

The adversary proceedings were consolidated for the purpose of determining the "common issues" identified by the parties and the court, i.e., whether a Ponzi scheme occurred and when insolvency began. (ECF No. 123). Those adversary proceedings not subject to the consolidation will be resolved separately by the bankruptcy court. Non-common issues remain to be determined in each particular adversary proceeding, such as the effect of the applicable statute of limitations to each defendant, whether that defendant has a defense to the trustee's claims, and an accounting to determine the amount of any recovery by the trustee.

The plaintiff filed his Motion for Partial Summary Judgment together with supporting declarations and legal authorities on December 3, 2012 (ECF No. 125). The hearing was scheduled for January of 2013, but at the request of the defendants, was continued to June 13, 2013. The bankruptcy court's recommendation regarding that Motion for Partial Summary Judgment is discussed and contained in this decision.

## **FACTS**

Many of the facts are recounted in the bankruptcy court's prior decision in adversary proceeding No. 11-80093-PCW11 on Defendants Sheldon Frank's and Margaret Miller's Motions to Dismiss (ECF No. 146) and other matters and will not be repeated herein. Simplistically, Doris Nelson, who had no prior business experience, lived in Canada in 1997 and began operating a short-term loan (commonly referred to as a "payday loan") business in British Columbia, Canada. In 2001, Ms. Nelson relocated herself and her business to Spokane, Washington. The payday loan business transformed from a "store front" to an internet business. Ms. Nelson established a pattern of obtaining funds from individual "investors" or "lenders" from the beginning of the business, and that pattern continued into 2008. Promissory notes were issued evidencing the funds obtained. For convenience, the individuals or entities providing those funds to the debtor will be referred to as "lenders" in this decision. Specific relevant facts will be recounted in addressing the issues presented.

## **STANDARDS FOR SUMMARY JUDGMENT**

A moving party is entitled to summary judgment where the party establishes that no genuine issue of material fact exits and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a). The moving party bears the initial burden of proving that there are no genuine issues of material fact. *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008). "In

response to a properly submitted summary judgment motion, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial." *Id.* "Merely alleging the existence of a factual dispute is insufficient to defeat a summary judgment motion; rather, there must exist in the record a genuine issue of material fact." *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 629 (Bankr. S.D. Ohio 2006). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The judge's function in ruling on a summary judgment motion is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In her affidavit, Ms. Nelson states that she "never knowingly or intentionally defrauded anyone" nor did she "form the Debtor for the purpose of engaging in a Ponzi scheme." Nelson Aff. (ECF No. 353), ¶¶ 39, 42 and 43. She states that promissory notes were not "rolled over" to avoid depletion of the debtor's cash. Nelson Aff. (ECF No. 353), ¶ 18. No supporting information was provided. A general denial of wrongdoing by a defendant is not sufficient to create a genuine issue of fact. Fed. R. Bankr. P. 7056, incorporating Fed. R. Civ. 56, provides:

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

To allow a defendant accused of wrongdoing to defeat summary judgment by simply denying any intent to do wrong would render summary judgment motions futile. Intent to defraud, harm, or delay creditors may be demonstrated and typically is demonstrated by circumstantial evidence. The defendant must create a genuine issue of fact regarding the circumstantial evidence, not simply deny any intent.

Self-serving conclusionary assertions are insufficient to successfully oppose a summary judgment motion. In an adversary complaint seeking a denial of discharge under 11 U.S.C. § 727(a)(2)(A) for intent to hinder, delay, or defraud creditors, the Ninth Circuit stated:

Federal Rule 56(e) requires that an adverse party not "rest upon the mere allegations or denials" of his pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Thus, once the movant has made a showing sufficient to meet his "initial burden to show the absence of a material and triable issue of fact; the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Richards*, 810 F.2d at 902 (citing *General Business Systems v. North American Philips Corp.*,

699 F.2d 965, 971 (9th Cir.1983); *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

*Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 272 (B.A.P. 9th Cir. 1990). Ms. Nelson's mere statement of a fact or denial, unsupported by any supporting facts or information, is not sufficient. *See also Matsushita Elec.*, 475 U.S. 574.

## ISSUES

1.      Did the operations of the debtor constitute a Ponzi scheme?

2.      When did the debtor become insolvent?

## I.

## DID DEBTOR ENGAGE IN A PONZI SCHEME?

The term Ponzi scheme derives from the Supreme Court's description of "the remarkable criminal financial career of Charles Ponzi" in *Cunningham v. Brown*, 265 U.S. 1, 7, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Charles Ponzi was the name of the perpetrator of the first known such scheme. The phrase is applied to any fraudulent arrangement whereby early investors are repaid from the contributions of later investors.

Ponzi schemes have a distinct pattern of repaying earlier investors from funds contributed from later investors. Variations in the pattern may occur depending upon the manner in which the scheme was implemented or the circumstances in which it

arose. Those variations are many, but do not alter the discernable pattern of such schemes.

### A. **Essential Nature of a Ponzi Scheme**.

A Ponzi scheme is a financial fraud as it induces investment by creating an appearance of distribution to new investors of profits from a successful business venture. The distributions to earlier investors create an illusion that a legitimate profitable business exists, thus inducing further new investments by later investors. "Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes." *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990).

> A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any "profits" of the underlying business venture. The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment. (Citations omitted).

*Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991).

> A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business

opportunity exists and inducing further investment." *In re United Energy Corp.*, 944 F.2d 589, 590 n. 1 (9th Cir.1991). *See generally Cunningham v. Brown,* 265 U.S. 1, 7–9, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (detailing the remarkable criminal financial career of Charles Ponzi).

*Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008).

Although not a decision in this circuit, *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) refers to many decisions articulating this general principle.

Numerous decisions have established two broad principles. First, the label "Ponzi scheme" has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud. *See Rosen v. Neilson (In re Slatkin),* 310 B.R. 740, 743 n. 3 (C.D.Cal.2004) (citing *Danning v. Bozek (In re Bullion Reserve of N. Am.),* 836 F.2d 1214, 1219 n. 8 (9th Cir.1988)) ("A 'Ponzi' scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors."); *Hayes v. Palm Seedlings Partners (In re Agric. Research and Tech. Group, Inc.),* 916 F.2d 528, 536 (9th Cir.1990) ("Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes."); *Cuthill v. Kime (In re Evergreen Sec., Ltd.),* 319 B.R. 245, 249 (Bankr.M.D.Fla.2003) (finding a Ponzi scheme where the debtor "used most funds received from new investors to pay prior investor claims"). Second, where funds acquired from the later investors are used to make payments to earlier investors in redemption of impaired or non-existent account balances and fictitious profits, "actual intent" to hinder, delay and defraud is presumed. *Quilling v. Stark,* 2006 WL 1683442, at *6 (N.D. Tex. June 19, 2006).

It is not disputed that the debtor operated a legitimate business, i.e., the payday loan business. The Examiner's early investigation focused on the question of whether

that business should continue to operate in the chapter 11. His Preliminary Report filed May 19, 2010, concluded that the post-bankruptcy petition operation, which was not then managed by Ms. Nelson, was profitable (No. 09-06194-PCW11, ECF No. 182, p. 33). His First Interim Report filed August 12, 2010 (No. 09-06194-PCW11, ECF No. 240), reflected his examination of pre-petition matters and particularly noted the existence of various related entities and the intercompany transfers among them. The Examiner reported that his next phase of investigation would focus on the transfer of funds by and to lenders, particularly from 2006 through 2008, to determine if the payday loan business generated sufficient cash flow to repay those funds. The Examiner's Final Report was filed November 17, 2011 (No. 09-06194-PCW11, ECF No. 991), in which he concluded that as early as 1998, the debtor's operations did not generate sufficient profits or cash flow to repay lenders. He concluded that the source of payments made to lenders were the receipts from later lenders (No. 09-06194-PCW11, ECF No. 991, p. 136). The report concludes that the debtor's operations "exhibit the financial characteristics of a Ponzi scheme. . . ." (No. 09-06194-PCW11, ECF No. 991, p. 137).

In support of the Motion for Partial Summary Judgment, the plaintiff filed the declaration of its expert, Mr. Michael Quackenbush (ECF No. 130). At page 16, he concluded that the payday lending business was operated at a loss from its beginning and did not produce profits sufficient to pay lenders. "Rather from its inception, new

investor funds were used to pay amounts due to prior investors." Mr. Quackenbush developed charts visually describing the relationship between the lender deposits and disbursements and concluded that eighty-nine percent (89%) of lender deposits were used to repay earlier lenders. Quackenbush Decl. (ECF No. 130), p. 31.

The plaintiff also retained as an accounting expert, Mr. Dan Harper. His task was to exercise his professional judgment to opine whether the debtor's receipt of funds from lenders was a component of a legitimate business plan related to the payday loan business. Mr. Harper's conclusion was that the debtor's activities demonstrate that the debtor engaged in a Ponzi scheme "from the inception of the earliest of the companies, onward." Harper Decl. (ECF No. 131), p. 8.

The defendants presented evidence of their expert, Ms. Marie Rice (ECF No. 274) and an affidavit of Ms. Nelson (ECF No. 151). The plaintiff's motion to strike the declaration of Ms. Rice (ECF No. 309) was granted by way of a written memorandum decision (ECF No. 345), as the declaration did not fulfill the requirements of Fed. R. Evid. 702. The motion to strike the affidavit of Ms. Nelson was granted in part and denied in part. For convenience, a redacted affidavit reflecting the ruling on the motion is attached to the order granting in part and denying in part (ECF No. 353).

The evidence in support of the plaintiff's Motion for Partial Summary Judgment reveals the hallmark of a Ponzi scheme. There are, however, other characteristics of reported Ponzi schemes which are present in this situation.

**B.    Other Characteristics**.

As was recognized by the district court in *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Inv. Fund, Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y 2007), although Ponzi schemes are revealed by their essential characteristic or pattern of payment of earlier investors with funds of later investors, the manner in which such schemes are conducted is limited only by the imagination of the perpetrator. "[T]here is no precise definition of a Ponzi scheme and courts look for a general pattern, rather than specific requirements." *Id*. Certain characteristics are often, but not invariably, present in the pattern underlying such schemes.

The most common characteristic which appears to be almost invariable, is a promise of a high rate of return on the funds. The actual amount of the "high" rate of return will vary depending upon the economic conditions which exist during the operation of a Ponzi scheme. Although not usually articulated in the reported decisions, the rate is "high" in comparison to general market and economic conditions then existing. *Donell v. Kowell,* 533 F.3d at 766 (20 percent return every 90 days); *In re Taubman,* 160 B.R. 964, 972 (Bankr. S.D. Ohio 1993) (typically 15 to 18 percent per annum); *In re Manhattan Inv. Fund, Ltd.*, 397 B.R. at 12 (27.4 to 12.4 percent);

and *Scholes v. Lehmann*, 56 F.3d 750, 752 (7th Cir. 1995) (10 to 20 percent per month return). As stated in the *Donell* case, investors are often offered a business opportunity which "is too good to be true" and, unfortunately, it is not true. That is certainly the situation in this case, as the promissory notes issued to investors commonly bore an interest rate of 40 percent to as much as 60 percent and, even on occasion, 75 percent. Plaintiff's LR 56 Statement of Undisputed Facts (hereinafter "SOF") (ECF No. 127), ¶ 9; Hall Decl. (ECF No. 129), pp. 5 and 20; and Nelson Aff. (ECF No. 353), ¶ 11.

One common characteristic is the comingling of investor funds. In most Ponzi schemes, the funds being received purport to be some form of ownership interest in an asset, whether a tangible asset or investment account. No separate investor accounts are established and deposits of funds from, and payment of funds to investors are comingled not only with other investor funds, but with any other funds received. *In re Taubman*, 160 B.R. 964; *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424 (Bankr. S.D. Tex. 1997). In the latter case, the perpetrator had been criminally convicted of fraud as is true in many of the reported decisions. Ms. Nelson has been indicted, but not convicted. Plaintiff's SOF (ECF No. 127), ¶ 44. The *In re Ramirez Rodriguez* case did not solely rely upon that conviction, and the decision contains a description of the scheme. In the LLS situation, the funds were evidenced by promissory notes and appeared to be loans, and the comingling of the funds received from each lender with funds of other lenders is not relevant.

MEMORANDUM DECISION RE: PLAINTIFF'S . . . ~ Page 15

The perpetrator and family members or insiders often utilize the funds for personal use. *In re Ramirez Rodriguez*, 209 B.R. 424 (payment of personal expenses of the perpetrator); *In re Bayou Group, LLC,* 362 B.R. 624 (incentive bonus to insiders who later pled guilty to criminal charges); *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. 641 (Bankr. M.D. Fla. 2002) (debtor used funds to enrich insiders); and *In re Taubman,* 160 B.R. 964 (perpetrator and husband's personal and other business expenses paid). From 1997 through 2009, Ms. Nelson withdrew at least $4.4 million for personal use. In two years, from 2007 through 2008, $500,000 was used by her for personal expenditures, including clothing and a Mercedes Benz. Approximately $1.3 million of funds received from lenders were used to purchase and renovate an office building owned by a corporation controlled by her husband.[1] Plaintiff's SOF (ECF No. 127), pp. 10-11, citing Kriegman Decl. (ECF No. 128), Ex. "A," Harper Decl. (ECF No. 131), ¶¶ 27-30 and 39-40, and Hall Decl. (ECF No. 129), ¶¶ 34-35. Ms. Nelson states that she was entitled to use these funds for these purposes. However, no rationale or basis for that self-serving statement has been provided other than she was entitled to use the funds as they were "compensation." Nelson Aff. (ECF No. 353), ¶¶ 27-30.

As stated above, this flat denial is not sufficient to raise a genuine issue of fact.

---

[1] The Affidavit of Nelson (ECF No. 353), ¶ 32 states the "refurbish" of the building was for the debtor's office.

It is common that the scheme involves several related entities with multiple confusing and ultimately unjustifiable intercompany transfers. *In re Ramirez Rodriguez*, 209 B.R. 424, and *In re Taubman*, 160 B.R. 964. LLS directed lenders to deposit funds into various accounts of the different corporate entities. Funds were comingled and transferred indiscriminately with little or no effort to document any business rationale. Hall Decl. (ECF No. 129), ¶ 4.

The scheme is always founded upon some legitimate business enterprise, whether that enterprise actually exists or is only a "sham" which exists only in the mind of the perpetrator. It strains credibility to assume that a person engaging in a Ponzi scheme would not justify the scheme by describing it as a legitimate business opportunity. Investors are encouraged to invest or lenders to loan based upon the appearance of a profitable legitimate business. In *In re Ramirez Rodriguez*, 209 B.R. 424, the business represented to investors did not exist, although the debtor did have some other inconsequential legitimate business operations. *In re Canyon Sys. Corp.*, 343 B.R. 615, involved sales of gold coins. The court stated that one of the characteristics of a Ponzi scheme is a purported business operation, which in reality, produces little or no profits. A small percentage of funds were used in the legitimate business, but no income was produced by that business in *In re World Vision Entertainment, Inc.*, 275 B.R. 641. The perpetrator in *Rosen v. Neilson (In re Slatkin)*, 310 B.R. 740 (C.D. Cal. 2004), had pled guilty to criminal charges, and the court relied

upon that plea to establish the existence of a Ponzi scheme. It noted, however, that a small percentage of funds had been used for legitimate business purposes, which may have earned some profit. The infamous Ponzi scheme of Bernie Madoff resulted in his guilty plea. In describing the scheme, it was noted that some legitimate trading in the stock market occurred by some of the entities he controlled. *Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities, LLC* (*In re Bernard L. Madoff Inv. Securities, LLC*), 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

There is no dispute in this case that LLS did operate a legitimate payday loan business. LLS, from 2000 through 2004, used only 16 percent of funds received from lenders in the payday loan business. During its entire operations, only 30 percent of the funds were used in that business. Plaintiff's SOF (ECF No. 127), ¶¶ 14 and 15, citing Quackenbush Decl. (ECF No. 130), Ex. 10, and Harper Decl. (ECF No. 131), ¶¶ 16 and 38. As concluded by the Examiner in his Second Interim Report (ECF No. 306) at p. 17, there was no positive cash flow or profit from the payday loan business to pay lenders.

Some Ponzi schemes involve the payment of "commissions" or bonuses to individual investors who encourage other individuals to later invest in the scheme. *In re Ramirez Rodriguez*, 209 B.R. 424, and *In re World Vision Entertainment, Inc.*, 275 B.R. 641. LLS paid commissions to third parties who solicited new lenders, typically 10 percent of the amount received from the new lender. Plaintiff's SOF (ECF No.

127), ¶ 36, citing to Harper Decl. (ECF No. 131), ¶¶ 25-26, Hall Decl. (ECF No. 129), ¶¶ 13-17, and Frye Decl. (ECF No. 132), Ex. B. LLS records reflect that 42 lenders recruited others to participate. Hall Decl. (ECF No. 129), ¶ 38.

The alleged profitable legitimate business which encourages participation in such schemes may take many forms. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, involved the purchase of limited partnership interests in a limited partnership which purchased palm seedlings. *In re Bayou Group, LLC,* 362 B.R. 624, solicited investments in particular hedge funds. Memberships in a discount shopping and travel service was the form of solicitation in *Dicello v. Jenkins (In re International Loan Network, Inc.)*, 160 B.R. 1 (Bankr. D. Dist. Col. 1993). The scheme in *In re Bernard L. Madoff Inv. Securities, LLC*, 424 B.R. 122, was based upon investments in publically traded stocks. The *Taubman* case referenced above is noteworthy as in that case, as in the current situation, funds were solicited not as an ownership or equity interest in a business, but as a loan. LLS, like *Taubman*, involved the use of standard form promissory notes issued to lenders. Hall Decl. (ECF No. 129), p. 5; Quackenbush Decl. (ECF No. 130), p. 8.

Another characteristic of the scheme described in *Taubman* occurs in the LLS situation. Both schemes demonstrate a pattern of "rolling over" the promissory notes. Ms. Nelson denies the notes were "rolled over" to avoid payment. She does not address the fact that hundreds of notes were "rolled over." Nelson Aff. (ECF No. 353),

¶ 18; Plaintiff's SOF (ECF No. 127), ¶ 16, citing Harper Decl. (ECF No. 131), ¶¶ 42-44, and Quackenbush Decl. (ECF No. 130), pp. 15 and 27. Just prior to the note obligations reaching maturity, new notes were issued to replace the existing notes. "Rolling over" or replacing current obligations to investors on existing investments with new investments occurred in *In re Bayou Group, LLC,* 362 B.R. 624 (transfer of ownership interests from original hedge funds into newly created hedge funds) and *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528 (transfer of limited partnership interests from existing entity to newly created limited partnership). The "rolling over" of obligations is a common characteristic of Ponzi schemes.

In order to continue the scheme and encourage additional investors, Ponzi scheme perpetrators often provide false or misleading financial information to existing and new investors. *See In re Bayou Group, LLC,* 362 B.R. 624, and *In re Manhattan Inv. Fund, Ltd.,* 397 B.R. 1. The information provided investors regarding their accounts was "bogus" and financial statements of the debtor were false in *In re Bernard L. Madoff Inv. Securities, LLC*, 424 B.R. 122. LLS, throughout its history, compiled false and misleading financial statements and provided such statements to potential lenders. Plaintiff's SOF (ECF No. 127), ¶¶ 33 and 34, citing to Harper Decl. (ECF No. 131), ¶¶ 42-47, and Gargiulo Decl. (ECF No. 133), ¶¶ 1-15. The final Examiner's report at ECF No. 991 at p. 10 states that his investigation revealed significant "inappropriate" accounting, which "had the effect of inflating revenue,

earnings and assets on the financial statements of the respective Companies." Further, the Examiner noted at p. 129 that as to the financial information LLS provided to the British Columbia Securities Commission in 2008, "[t]hese financial statements are a complete fabrication."

The only conclusion possible is that this debtor engaged in a Ponzi scheme. Not only was the essential nature demonstrated by the expert testimony, i.e., the only significant source of repayment to earlier lenders were the funds received from later lenders, but many of the common characteristics of Ponzi schemes are present.

## II.

## A PONZI SCHEME CONSTITUTES ACTUAL FRAUD

The plaintiff's claim to recover funds in these "claw-back" adversary proceedings is based upon 11 U.S.C. § 548(a)(1) of the Code and upon Washington's enactment of the Uniform Fraudulent Transfer Act (hereinafter "UFTA"), RCW 19.40.

### A.    Actual fraud under 11 U.S.C. § 548(a)(1)(A).

This section of the Bankruptcy Code provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

The bankruptcy trustee in *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700 (9th Cir. 2008) commenced "claw-back" adversaries against defendants who had received transfers from the debtor who had engaged in a Ponzi scheme. The perpetrator had pled guilty to criminal charges so there was no dispute as to its existence. The decision held that "the mere existence of a Ponzi scheme" is sufficient to satisfy the actual intent requirement of 11 U.S.C. § 548(a)(1)(A). Direct proof of fraudulent intent is rarely available and generally subjective intent cannot be determined in the context of a summary judgment motion. However, actual intent to defraud is established as a matter of law in cases in which the debtor operates a Ponzi scheme.

In yet another reported decision involving the efforts of a bankruptcy trustee to recover transfers occurring as part of the debtor's operation of a Ponzi scheme, it was held:

As previously noted, the mere existence of a Ponzi scheme, which could be established by circumstantial evidence, has been found to fulfill the requirement of actual intent on the part of the debtor. Appellee convincingly argues that Agretech could not possibly have made the first payment from the sale of the seeds of the first shipment and that the money for this payment is traceable to $5,000,000.00 in new investments. Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes.

*In re Agricultural Research and Technology Group, Inc.*, 916 F.2d at 536. *See also In re Slatkin*, 310 B.R. 740. This principle has been recognized in numerous decisions.

> Actual intent to hinder, delay or defraud may be established as a matter of law in cases in which the debtor runs a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors. Thus, "bankruptcy [and other] courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud." *Bauman,* 326 B.R. at 850. *See also Conroy v. Shott,* 9 Ohio Misc. 117, 363 F.2d 90, 91–92 (6th Cir.1966) (quoting with approval the opinion of the district court granting a trustee's motion for summary judgment and concluding that "the question of intent to defraud is not debatable" given the fact that the debtor was engaged in a Ponzi scheme); *Emerson v. Maples (In re Mark Benskin & Co.),* 59 F.3d 170, 1995 WL 381741, at *5 (6th Cir. June 26, 1995) ("Since 1966, this court has found that the question of intent to defraud in a Ponzi scheme is not debatable." (internal quotation marks omitted)); *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.),* 280 B.R. 103, 110 (Bankr.E.D.Pa.2002) ("Numerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme."); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.),* 275 B.R. 641, 656 (Bankr.M.D.Fla.2002) ("A Ponzi scheme is by definition fraudulent.... Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors."); *M & L Bus. Mach.,* 160 B.R. at 857 ("[I]n a Ponzi scheme the only inference that a court can make is that the Debtor had the requisite intent to hinder, delay or defraud under § 548(a)(1)."); *Indep. Clearing House,* 77 B.R. at 860 ("One can infer an intent to defraud future [participants] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other inference is possible.... The [debtor] must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them." (citation omitted)).

*In re Canyon Sys. Corp.*, 343 B.R. at 636-637.

**B.** **Actual fraud under RCW 19.40**.

The plaintiff trustee in this situation seeks not only to recover under 11 U.S.C. § 548(a)(1), but also Washington's enactment of the UFTA. The Ninth Circuit in applying the California enactment of the relevant provision of the UFTA [which is identical to RCW 19.40.41(a)(1)] concluded that transfers made in furtherance of a Ponzi scheme are transfers resulting from actual fraud under the UFTA. *See In re AFI Holding, Inc.*, 525 F.3d 700, and *Donell v. Kowell*, 533 F.3d 762. Once a Ponzi scheme is determined to exist, there is no question of fact regarding actual fraud under RCW 19.40.41(a)(1).

The same conclusion regarding the Texas enactment of the UFTA was reached in *In re Ramirez Rodriguez*, 209 B.R. 424. Although the existence of the Ponzi scheme had been established by criminal conviction, the court stated that its existence satisfied the actual fraud requirement contained in the UFTA as well as 11 U.S.C. § 548(a)(1) of the Code. *See also In re International Loan Network, Inc.*, 160 B.R. 1, referring to Maryland's enactment of the UFTA and *In re Slatkin*, 310 B.R. 740, referring to Hawaii's enactment of the UFTA. *Stoebner v. Ritchie Capital Management, LLC (In*

*re Polaroid Corp.)*, 472 B.R. 22 (Bankr. D. Minn. 2012) reaches the same conclusion as to Minnesota's enactment of the UFTA.[2]

### III.

### WHEN DID THE DEBTOR BECOME INSOLVENT?

#### A.    Insolvency under the Bankruptcy Code.

As an alternative theory of recovery, the plaintiff argues that he is entitled to prevail under 11 U.S.C. § 548(a)(1)(B). The statute provides in section (A) that transfers resulting from actual fraud may be avoided <u>OR</u> if no actual fraud is present, may be avoided as constructive fraud under (B) if the debtor

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I).

---

[2] The determination of actual fraud arising from a Ponzi scheme rather than a determination of constructive fraud is of great importance. The statute of limitations contained in UFTA to recover transfers arising from actual fraud is four years from the date of discovery. The statute of limitations contained in UFTA to recover transfers arising from constructive fraud is two years. The statute of limitations under 11 U.S.C. § 548(a)(1)(A) and (B) limits recovery for transfers made within two years of the bankruptcy filing.

As the existence of a Ponzi scheme establishes actual fraud as a matter of law, normally it would not be necessary to discuss the elements of constructive fraud. However, the plaintiff has raised both actual and constructive fraud as causes of action so both will be analyzed.

Constructive fraud is based on two concepts, "reasonably equivalent value" and insolvency. The requirement of reasonably equivalent value" will be discussed hereafter. This discussion will concern the requirement of insolvency. The term "insolvent" is defined in 11 U.S.C. § 101(32)(A) as a situation where the sum of an entity's obligations is greater than the value of its assets, commonly referred to as the "balance sheet" test. The test for insolvency set forth in 11 U.S.C. § 548(a)(1)(B)(ii), however, is a question of whether the entity's obligations are beyond its current ability to pay, commonly referred to as the "cash balance" test. The trustee has presented evidence in support of both tests.

The Examiner spent 21,349 hours reviewing the debtor's past and then current business operations of the numerous entities, which comprise the consolidated debtor. He met with Ms. Nelson and the debtor's employees and worked closely with the debtor's accounting staff. Memorandum Decision (ECF No. 345), p. 5. As explained in his February 9, 2011, Second Interim Report (ECF No. 306), the Examiner reviewed information provided by the hundreds of lenders in the proof of claim process. Reconciliation, examination, and re-creation of financial records are tasks

commonly performed by examiners appointed by bankruptcy courts. The Examiner filed four reports with the court describing his work and his conclusions regarding the financial affairs of the entities, which comprise the consolidate debtor.

Mr. Quackenbush, the plaintiff's expert regarding the issue of insolvency, reviewed the Examiner's investigation of and conclusions regarding the debtor's financial situation. His report reflects approximately 650 hours of work. Mr. Quackenbush also engaged in some undescribed independent reconciliation and re-creation of the financial records Memorandum Decision (ECF No. 345), p. 6.

### 1.    The Balance Sheet Test for Insolvency.

There is no question that the debtor's financial records from 1997 through 2002 were in disarray and many were nonexistent. Significant efforts were required by the Examiner and the debtor's accounting staff to create a picture of the debtor's financial status from source documents of the debtor and third parties for 1997 through 2002. Beginning in 2003, the records were better preserved, but some were incomplete or contained errors and there had been no reconciliation. For this reason, Mr. Quackenbush divided his examination and opinion between the two periods.

For the period from the inception of the business in 1997 through 2002, Mr. Quackenbush concluded that the debtor was insolvent on a balance sheet basis. Quackenbush Decl. (ECF No. 130), p. 19. He opined that the debtor was insolvent

during 2003 to the date of the bankruptcy filing in 2009 and prepared the following chart:

| Year Ended 12/31 | Debts In Excess of Assets |
|---|---|
| 2003 | $5,355,735 |
| 2004 | 9,168.363 |
| 2005 | 10,158,160 |
| 2006 | 23,360,078 |
| 2007 | 40,222,250 |
| 2008 | 65,667,591 |
| July 21, 2009 | 92,070,303 |

Quackenbush Decl. (ECF No. 130), pp. 20-23.

His report is attached to the declaration as Exhibit "A" and describes his conclusions in more detail.

## 2.   <u>Cash Flow Test or Ability to Pay Debts When Due</u>.

This is essentially a liquidity test to determine if the debtor has sufficient cash reserves or cash flow during a particular period to satisfy obligations when they become due during that period. The evidence reveals that the debtor had continual operating losses and could not meet any of the ratios commonly required to demonstrate liquidity. Mr. Quackenbush concluded that the losses were not apparent due to the increasing amount of funds provided by the lenders, but that the debtor was unable to pay its obligations as they became due. That condition existed from the inception of the business in 1997 until the date of the bankruptcy filing in 2009. Quackenbush Decl. (ECF No. 130), p. 28 and Ex. "A" thereto.

### B. <u>Insolvency Under RCW 19.40.41</u>.

Just as the trustee does not rely solely upon the actual fraud provision of 11 U.S.C. § 548(a)(1)(A), but also argues under subpart (B), so the trustee does not rely solely on the actual fraud provision of RCW 19.40.41(a)(1). He also argues under subpart (2), which is the constructive fraud provision.

Similar to the requirements of 11 U.S.C. § 548(a), the UFTA voids a transfer resulting from actual fraud or, as an alternative, a transfer made while the debtor is insolvent and for which no reasonably equivalent value is given. The evidence referenced above also meets the requirement of insolvency under the state statute.

UFTA does not define insolvency nor require the application of any specific accounting test to determine insolvency. In addition to the conclusions referenced above, Mr. Quackenbush also examined the question of whether the debtor had sufficient capital resource to continue business operations for the foreseeable future, commonly referred to as the "reasonable capital test." Mr. Quackenbush concluded that from 2000 to the bankruptcy filing, the debtor experienced net losses each year and had annual negative equity. The 10 year average debt to equity ratio, i.e., the amount of liabilities compared to equity, was 1.25. Quackenbush Decl. (ECF No. 130), p. 30. In other words, for every dollar of liability, the debtor had 25 cents of equity. Mr. Quackenbush's conclusion at ECF No. 130, p. 31, stated, "At no time,

during the period under this report, did the Debtor have a level of capital/equity sufficient to run its business."

To summarize, the moving party has produced evidence that the debtor was insolvent from its inception in 1997 to the 2009 bankruptcy and no genuine issue of fact exists regarding that conclusion.[3] The insolvency requirements of 11 U.S.C. § 548(a)(1)(B) and that of RCW 19.40.41(a)(2) have been meet.

### C. **Reasonably Equivalent Value**.

The "reasonably equivalent value" referenced regarding constructive fraud may be calculated by determining the amount the defendant initially transferred to the person who engaged in the fraudulent activity. Return of that initial loan or investment has been considered to be reasonably equivalent value. The same result occurs in situations arising from actual fraud if a defendant can demonstrate the defenses found in 11 U.S.C. § 548(c). To the extent the defendant gave value for the transfer and received the transfer in good faith, the plaintiff may only recover sums received in excess of the initial investment. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528. *See also In re AFI Holding, Inc.*, 525 F.3d at 705. In the context

_____

[3] Ms. Nelson in her affidavit states she made an original capital contribution. Nelson Aff. (ECF No. 353), ¶ 9. The Examiner and the plaintiff's experts state there is no evidence of any such capital contribution. Although this is a disputed fact, it is not material. Assuming Ms. Nelson made an initial capital contribution, it was inadequate to render the debtor solvent from 1997 to 2009.

of this case, the trustee may not recover any transfer up to the amount that the defendant initially loaned to the debtor if the defendant meets the good faith portion of the defense. [4]

The analysis required by both the Bankruptcy Code and UFTA to calculate the amount which may be recovered by the trustee in the context of a Ponzi scheme is contained in *Donell v. Kowell*, 533 F.3d at 771.

> In the context of a Ponzi scheme, whether the receiver seeks to recover from winning investors under the actual fraud or constructive fraud theories generally does not impact the amount of recovery from innocent investors. Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, *including* amounts which could be considered "return of principal." However, there is a "good faith" defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay. *See* CAL. CIV. CODE § 3439.08(a); *Scholes,* 56 F.3d at 759; *Agritech,* 916 F.2d at 535. Under the constructive fraud theory, the receiver may only recover "profits" above the initial outlay, unless the receiver can prove a lack of good faith, in which case the receiver may *also* recover the amounts that could be considered return of principal. CAL. CIV. CODE § 3439.08(d); *Scholes,* 56 F.3d at 757.

---

[4] The existence of these statutory defenses have resulted in some decisions referring to "the Ponzi scheme presumption" that transfers occurring as part of the scheme are presumably recoverable. It is not a presumption that a transfer occurring in the context of a Ponzi scheme is a transfer resulting from actual fraud. Rather, that results as a matter of law. Instead of referring to a presumption, it is more descriptive to refer to an affirmative defense which may limit a plaintiff's recovery if the defendant can produce evidence and satisfy the burden of demonstrating good faith and reasonably equivalent value.

Questions of fact remain in these "claw-back" cases regarding the amount of any recovery to which the trustee is entitled. Accounting will be necessary to determine if reasonably equivalent value was given by any particular defendant, i.e., the amount of the transfer which represents a return of the initial loan. Evidence must be received from each defendant regarding the defense of good faith, i.e., whether the defendant knew or should have known that the transfer occurred as the result of wrongful activity on the part of the debtor. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d at 536. Those factual questions will be addressed at the time of trial by the district court.

## <u>CONCLUSION</u>

It is the bankruptcy court's report and recommendation that the Plaintiff's Motion for Partial Summary Judgment (ECF No. 125) be **GRANTED**. The evidence conclusively demonstrates that this debtor engaged in a Ponzi scheme, and that the debtor was insolvent from its inception in 1997 to the 2009 bankruptcy. No genuine issues of material fact exist regarding these conclusions.

///END OF MEMORANDUM DECISION///